Estate of John J. Hessian, Deceased, Florence F. Peck, Executrix v. Commissioner.
Estate of Hessian v. Commissioner
Docket No. 110139.
United States Tax Court
1943 Tax Ct. Memo LEXIS 334; 1 T.C.M. (CCH) 1007; T.C.M. (RIA) 43203; April 29, 1943
*334 Milton Weiss, Esq., for the petitioner. James C. Maddox, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves income tax, the Commissioner having determined a deficiency of $15,152.95 for the year 1938. The issues are whether certain shares of stock received by the petitioner's decedent constituted taxable income, and, if so, whether the respondent properly determined that the value of the stock should be included in income for the taxable year, rather than the following year. The value of the stock was also put in issue by the pleadings, but has since been agreed upon by counsel for the respective parties. Findings of Fact The petitioner is the executrix of the will of John J. Hessian, deceased. Hessian filed his income tax return for the taxable year with the collector for the first district of New York. In 1938, the petitioner's decedent (hereinafter sometimes called Hessian) was vice-president of and a member of the board of dirrectors of Doubleday, Doran & Co., Inc., printers and publishers (hereinafter sometimes referred to as Doubleday). He managed its printing plant and operations, and was paid a salary of $27,500 *335 per annum. As the result of study and discussion among the officers and directors of Doubleday, a new corporation, known as Country Life Press Corporation, and hereinafter referred to as Country Life, was formed in 1938, for the purpose of taking over the printing plant and equipment and the printing operations of Doubleday. Pursuant to resolutions adopted by the directors on May 6, 1938 and by the common stockholders on May 31, 1938, certain of Doubleday's land, buildings and equipment were mortgaged by it to secure a loan of $800,000. The mortgage assets were then conveyed to Country Life in consideration of its assumption of the mortgage, the issuance to Doubleday of 10,000 shares of $100 par 6 per cent cumulative preferred stock, and 50,000 shares of $1 par common stock of Country Life, and the execution and delivery of promissory notes of the face amount of $200,000. At the same time, Doubleday and Country Life entered into a contract by which the latter agreed to do the printing and manufacturing work required by the former, to the extent permitted by plant capacity. The proponents of the plan for formation of Country Life, and the assumption by it of Doubleday's printing *336 operations, had always intended that Hessian should retain the management of the printing business. It was contemplated that he be employed as general manager of the new corporation, and that he acquire a stock interest in it. At the meeting of Doubleday's directors on May 6, 1938, it had been resolved that 10,000 of the 50,000 shares of common stock of Country Life be issued to Doubleday, be transferred to Hessian in consideration of his entering into an employment contract with Country Life for a period of at least five years. At the meeting of stockholders on May 31, 1938, it was rexolved that in consideration of the proposed execution by Hessian of the employment contract, 10,000 shares of Country Life stock be "issued or sold and delivered to him, upon such terms as the Board of Directors may negotiate." In connection with the formation of Country Life, and the acquisition of its stock by Doubleday, bona fide residents of the State of New York owning Doubleday stock were given a revocable option of exchanging their holdings on the following basis: 1 share of Doubleday First Preferred stock for 1 share of preferred stock and 1 share of common stock of Country Life; 1 share *337 of Doubleday Class B Preferred stock for 1 share of preferred stock and 1/2 share of common stock of Country Life; 20 shares of Doubleday common stock for 3 shares of preferred stock of Country Life. Out of the 50,000 shares of Country Life common stock issued to Doubleday, it would have been called upon to transfer a total of 6,533 1/2 shares, if all of its qualified stockholders had exercised the foregoing exchange option. Of that number, 1,251 1/2 shares were actually taken up. The exact number of shares of Country Life preferred stock subject to the exchange option is not disclosed. Of the 10,000 shares of preferred issued to Doubleday, a total of 5,533 1/2 were actually taken by its stockholders in exchange for holdings in Doubleday. At the stockholders' meeting of May 31, 1938 it was resolved that any stock of Country Life owned by Doubleday, after consummation of the foregoing exchange option, "be sold, at such time and upon such terms and conditions as the Board of Directors may determine." Doubleday acquired the 10,000 shares of preferred and 50,000 shares of common stock of Country Life at some time prior to June 17, 1938. At that time the number of shares of common *338 stock which it would be called upon to transfer to its own shareholders under the exchange option granted to them was undetermined. On June 17, 1938, Country Life entered into a contract with Hessian whereby he was employed as its general manager for a period of five years, at an annual salary of $27,500. On the same day, he entered into a contract with Doubleday by which he agreed to buy and Doubleday agreed to sell all the shares of common stock of Country Life (therein referred to as the Press) which it should own upon termination of the outstanding exchange option granted to its stockholders, and in any event not later than July 18, 1938. Other material provisions of the contract are as follows: * * * The purchase price of the shares of the Press so to be sold shall be an amount equal to $5. per share, multiplied by the number of shares actually sold in excess of 10.000. Payment for the shares so sold shall be made by the delivery to Doubleday by Mr. Hessian of his promissory note in the principal amount of the purchase price, with interest at the rate of 3% per annum, payable July 1st and January 1st in each year, and maturing July 1, 1941. All of the shares of stock so to be *339 sold shall be pledged with Doubleday as collateral security for the note so to be given in payment of the purchase price. Unless and until default shall exist in the payment of interest upon the note so to be given in payment of the purchase price, Mr. Hessian shall have full voting rights in the Common Stock of the Press so to be purchased. Until the payment in full of the purchase price of said shares of Common Stock, all dividends received upon said shares of Common Stock pledged with Doubleday shall be received by Doubleday and applied by it in reduction of the principal amount of the unpaid purchase price, and Mr. Hessian agrees to give an appropriate order or order to the Press to provide for the payment of dividends upon such Common Stock to Doubleday during the period above mentioned. None of the stock was actually received by Hessian during 1938. On October 17, 1938 the time for determining the exact number of shares to be purchased by him and for the delivery of his promissory note for the purchase price was extended until such time in the fall of that year as the president of Doubleday should return from England. It was also agreed on October 17, 1938, that if Hessian *340 should cease to be the general manager of Country Life, Doubleday should have an option, for sixty days, of purchasing from him or his estate, at book value, all common stock in Country Life then owned by him. On January 19, 1939, delivery of 40,000 shares was made, and at the same time Hessian gave to Doubleday his promissory note for $150,000, maturing on January 1, 1942, and bearing interest at the rate of 3 per cent per annum, payable semi-annually. He immediately deposited 30,000 shares with Doubleday as security for the performance of his obligations under the note. It was agreed then that delivery of the balance of the stock covered by the purchase contract, and of the promissory note in payment therefor, be extended until September 1, 1939. On August 31, 1939, the time for delivery was again extended until January 1, 1940. At some time subsequent to the receipt of the 40,000 shares on January 19, 1939, Hessian borrowed $30,000 from Doubleday. Payment of the indebtedness was secured by deposit of the 10,000 shares of Country Life received by the decedent on January 19, 1939, and not then deposited as security for the payment of his $150,000 note of that date. Doubleday's books *341 do not reflect any sale of Country Life stock to Hessian other than a sale of 30,000 shares. The only entries recording the sale were made in 1939; they disclose the receipt of Hessian's note for $150,000, the delivery to him of 40,000 shares, and the deposit by him of 30,000 shares as security for payment of the note. On the federal income tax return filed by Doubleday for its fiscal year ended April 30, 1939, under the heading, "Gain on sales and exchanges of Country Life Press Corporation capital stock, Year ended April 30, 1939," appears the following: Sale of 30,000 shares of Country Life Press Corporation common stock to John J. Hessian, and issuance of additional 10,000 shares to him. Received note for $150,000 due 1942 valued at $75,000. Delivered 30,000 common at $2,1654516 = $64,963.55. Gain on sales, $10,000. Issued 10,000 shares common at $2,1654516. The figure $2,1654516 represents the cost computed by Doubleday's accountants to be properly allocable to each share of Country Life common stock. None of the stock in Country Life received by Hessian from Doubleday was treated on the books of that corporation as additional compensation. The value of 10,000 shares *342 of common stock of Country Life in 1938 was $50,000. The respondent determined that 10,000 shares were made available to the petitioner's decedent during 1938, that the same constituted taxable income, and increased reported net income accordingly. Opinion In contesting the deficiency here involved, the petitioner does not argue that 10,000 shares of Country Life stock would not constitute taxable income if Hessian received them solely as consideration for his execution of the employment contract with Country Life. We think that the statutory definition of gross income is sufficiently broad to require their inclusion if that were the case, and accordingly confine ourselves to consideration of the two points to which argument is directed upon brief. The first of these is that the stock was purchased under a bona fide contract of sale, and the second is that in any event no income was realized in the taxable year since no stock was received until after its close. In view of our holding on the second point at issue, the following brief discussion will serve to dispose of the first of the questions presented: The exact number of shares of Country Life common stock which would *343 remain to Doubleday after the exercise of the option granted to its stockholders, was undetermined when the stock purchase contract was made on June 17, 1938. The terms of the contract provide for sale to Hessian of all such remaining shares at a price equal to $5 per share multiplied by the number of shares actually sold in excess of 10,000. We do not think that that contract, even standing alone, may be said to be entirely free from ambiguity; and when consideration is given to all the circumstances surrounding the transaction in question, of which the execution of the contract was only one, it becomes even less apparent that the respondent erred in determining that the actual consideration for the transfer of 10,000 of the shares was Hessian's execution of the employment contract with Country Life. In our opinion the actualities of the transaction are disclosed by the following excerpt from the testimony of Lawrence J. McNaughton, treasurer of Doubleday and a member of its board of directors: That was the understanding we entered into with Mr. Hessian, that he was to assume all the shares of common stock that we did not use to exchange and recapture our own shares, and that the *344 balance he was to buy at a figure of $5 a share, less the 10,000 that we would consider he was to receive free as an inducement for taking over the company. The respondent's determination that 10,000 shares of Country Life common stock constituted taxable income to Hessian is sustained. There remains the question whether $50,000, the stipulated value of 10,000 shares, is includible in income for the taxable year. The petition alleges that Hessian filed his return on the cash basis. The allegation is denied by the respondent's answer, and the record contains no evidence on the issue thus joined. Accordingly, if the item in question would be properly includible in income under either basis of reporting, our decision must be for the respondent. Since none of the stock was actually received by Hessian in 1938, none of it is taxable to him in that year, if he were on the cash basis, unless it can be said that there was constructive receipt. Under the accrual method of accounting, it would not constitute income for 1938 unless the right to receipt became fixed in that year. . We have held, under the *345 first issue, that 10,000 shares of stock became transferable to Hessian in consideration of his execution of the employment contract with Country Life. Since that event occurred in 1938, it may be said that the income in question was earned in 1938. However, it is still the fact that under the terms of the purchase contract, as extended by the subsequent agreement, no stock was deliverable to him until a date for final settlement was agreed upon with Doubleday, and then only upon Hessian's execution and delivery of a promissory note entailing a substantial obligation. In order to take possession of what would constitute income when received, it was necessary for him to perform his contract to purchase the remainder of the stock, which, as we view it, was actually a distinct and collateral obligation. It has frequently been said that the doctrine of constructive receipt is to be sparingly applied. See, e.g. ; ; and cf. . The respondent's regulations require that the income must be credited *346 or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and that it must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. There was here no turning of his back by Hessian upon income which was subject to his unfettered command. We think the condition that he perform his contract to purchase the remainder of the stock in order to receive income he had earned was just such a substantial limitation or restriction as, under the Commissioner's regulations, precludes a holding that there was constructive receipt. If Hessian made return on the accrual basis, we think that the same circumstance would preclude the inclusion of the item in question in income for 1938. Although he had an enforceable contract right to have the stock delivered to him, we do not think that the right became fixed in the sense in which that word was used in the Spring City Foundry case. An obligation, the payment of which will constitute income to the obligee is not so fixed and definite as to require its accrual, if payment is *347 dependent upon a condition. . Here the condition was the performance by Hessian of a separate contract obligation. It is true that he was legally bound to perform it, but he did not in fact do so in 1938. Until he did the transaction as a whole remained executory, and Doubleday's obligation remained contingent. In this respect the situation is analogous to that which we had under consideration in . There the taxpayer, on the accrual basis, had a contract right to receive a fixed amount of income in the form of discounts, to be paid to it upon its purchase of certain merchandise. We held that although the option was in the taxpayer, the contingency upon which payment was to be made was no less a real contingency, and that there was lacking the definiteness of liability to pay upon which the application of the accrual system of accounting is based. Here, too, although it may be assured that Hessian could have compelled the transfer of the stock in question in the taxable year by performing the condition upon which transfer depended, we think that until *348 that condition was performed there existed no such fixed and definite right as would require accrual. The situation entailed heavy financial obligation upon Hessian, that is, in order to receive 10,000 shares of stock, it was necessary for Hessian to give his note in payment for other large amounts of stock. Doubleday could have required him to give a note for at least $167,332.50, or $5 per share for the 33,466 1/2 shares left after deducting from 50,000 shares of the 10,000 shares and 6,533 1/2 the maximum amount subject to the option of other stockholders. A note actually was executed in January 1939 for $150,000. The assumption of such an obligation, in addition to the contract for compensation, was prerequisite to a right to delivery of the stock. We think it constituted a very real contingency. We hold, therefore, that whether the petitioner made return upon the cash or the accrual basis, the value of the 10,000 shares of stock is not includible in income for 1938. Decision will be entered for the petitioner.